HOGAN, District Judge.
Petitioner, Jerome Alvin Anderson, appeals the district court’s order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Anderson challenges his conviction of special circumstance murder on the grounds that (1) he was denied his constitutional right to remain silent; and (2) he was denied due process by the introduction of his involuntary confession into evidence, and by the exclusion of evidence of coercion in the interrogation process.
Facts
Anderson and the victim, Robert Clark, were friends. On the morning of July 9, 1997, a mutual acquaintance, Patricia Kuykendall, discovered that her car had been stolen. Anderson visited Kuyken-dall’s apartment that day and informed Kuykendall that Clark had a habit of borrowing cars, duplicating keys and stealing them later.
Anderson left to bring Clark back to Kuykendall’s apartment. Kuykendall and petitioner confronted Clark about the car. Clark denied involvement in the theft. As Kuykendall called the police, Clark left. About ten minutes later, Anderson and Kuykendall’s roommate, Abe Santos, followed after Clark.
At about 12:30 or 1:00 p.m. on that afternoon, an employee at Carl’s Jr. waited on three people in a white Ford Mustang at the drive-through window. The employee identified Anderson as the driver. At about 1:05 p.m. witnesses noticed a white Mustang with black trim and tinted windows on East Stillwater Road. One wit *1210 ness specifically saw Anderson standing behind the car and two other men standing by the car.
Clark’s body was discovered by the side of East Stillwater Road at about 2:30 p.m. He had been shot in the head four times. A methamphetamine pipe lay next to him, and a cigarette lighter was in his hand. Two pieces of hamburger and a fresh cigarette butt were also near the body, as well as spent .22 shell casings. Kuykendall’s key was discovered in Clark’s pocket.
A search of defendant’s car, a white Ford Mustang with black trim and tinted windows, revealed that the tire tracks found near the body were similar to the tire tracks it made. The search also revealed two live .22 rim fire casings under the seats similar to the spent casings found near Clark’s body. An analysis of the clothes Anderson wore that day revealed that three small blood stains on his shorts were consistent with Clark’s DNA and inconsistent with Anderson’s or Santos’ DNA.
Authorities took defendant into custody for a parole violation on July 12, 1997, at approximately 8:00 p.m. Officers interviewed Anderson for approximately three and a half hours. The interrogation included the following discussion with Detective O’Connor:
O’Connor: You act like you’re cryin’ like a baby, an’ you can’t cry for someone that was a no good ... an’ you killed him for a good reason.
Anderson: No, way! No, way. I — You know what, I don’t even wanna talk about this no more. We can talk about it later or whatever. I don’t want to talk about this no more. That’s wrong, that’s wrong.
O’Connor: Right now, you show your remorse.
Anderson: I have nothin’ to worry about, nothin’ to hide. That’s why I show no remorse. Nothin’ to worry about, nothin’ to hide. He was my friend, an’ there’s no way I would do it. No, way I would do it.
O’Connor: Were you high that day?
Anderson: No, sir. I — probably was later on. Yes.
O’Connor: Did you have any dope with you that ... that day?
Anderson: No, sir.
O’Connor: No, dope at all? What do you smoke with?
Anderson: I smoke with my ... my fingers.
O’Connor: When you smoke your dope what do you do with that? How do you smoke that?
Anderson: You smoke it with pipes and stuff like that.
O’Connor: Okay. What kind of pipes?
Anderson: Lines.
O’Connor: What kind of pipes?
Anderson: N’ah ... I would — I—
O’Connor: Well, what kind of pipes?
Anderson: Uh! I’m through with this. I’m through. I wanna be taken into custody, with my parole ...
O’Connor: Well, you already are. I wanna know what kind of pipes you have?
Anderson: I plead the fifth.
O’Connor: Plead the fifth. What’s that?
Anderson: No, you guys are wrong. You guys are wrong. You guys have — I’ve tried to tell you everything I know. As far as I know, you guys are lying, uh, making things up, extenuating and that’s not right. It’s not right.
O’Connor: We’re not makin’ anything up.
Anderson: Sir, sure you are.
*1211 O’Connor: What are we makin’ up? Anderson: You’re tellin’ me that I didn’t have tears in my eyes.
O’Connor: Yeah.
Anderson: You’re tellin’ me, okay, that, uh, uh, Abe said I kilt him. That’s a lie.
Officers then showed Anderson a videotaped interview in which Abe Santos confessed to watching defendant shoot Clark. Defendant eventually confessed.
Right to Remain Silent
Anderson asserts that he was denied his constitutional right to remain silent during this exchange. The state court concluded that while the defendant articulated words that could, in isolation, be viewed as an invocation of his right to remain silent, given the totality of the circumstances, the defendant did not intend to terminate the interview. The state appellate court quoted the reasoning provided by the trial court:
The interrogating officer did not continue or reinitiate the interview by posing the question: “plead the fifth. What’s that?” The questions can reasonably be characterized as a request for clarification or confirmation that the defendant wished to assert his right to remain silent, and nothing more. What followed is important to a determination of the question. Specifically, the defendant launched off on a discourse and, ultimately engaged in a debate without making any reference to an invocation of the right to remain silent. It was the defendant, not the interrogators, who continued the discussion.
The appellate court further reasoned that “the interrogating officer testified he believed that in saying, T plead the fifth’ defendant was simply indicating an unwillingness to discuss the details of his drug use, and not a desire to terminate the interrogation.”
The state court thus determined that the detective’s further questioning was not inappropriate:
In the present case, the defendant’s comments were ambiguous in context because they could have been interpreted as not wanting officers to pursue the particulars of his drug use as opposed to not wanting to continue the questioning at all. By asking defendant what he meant by pleading the fifth, the officer asked a legitimate clarifying question.
If a suspect indicates in any manner during questioning that he wishes to remain silent, interrogation must cease. Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966). Any statement taken after invocation of the privilege would constitute the product of compulsion. Id. at 474, 86 S.Ct. 1602. However, “when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants [to invoke the privilege].” Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that the statement, “Maybe I should talk to a lawyer,” is not necessarily a request for counsel). Clarifying questions “minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect’s statement.” Id. “If the suspect’s statement is not unambiguous or unequivocal ... the officers have no obligation to stop questioning.” Id. at 461-62, 114 S.Ct. 2350.
Here, Anderson arguably invoked his right to remain silent on two occasions. First, he stated, “I don’t even wanna talk about this no more. We can talk about it later or whatever. I don’t want to talk *1212 about this no more,”[1] and then he stated, “I plead the fifth.” Anderson did not express a desire to remain silent in response to the clarifying question. As noted above, the state court concluded that Anderson’s comments were ambiguous and that the interrogating officer’s question sought clarification. These are the state-court determinations we must review on appeal.
If this case were not before us on 28 U.S.C. § 2254 habeas review, we might be writing a very different opinion. There’s definitely more than one way to interpret Detective O’Connor’s interrogation. And, the state court’s interpretation might not be the most plausible one. But in federal habeas proceedings under AEDPA,[2] great deference is given to state-court factual and legal determinations.
To reverse under AEDPA, we would have to find the state-court conclusion to be “an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2); see also Rice v. Collins, — U.S. —, 126 S.Ct. 969, 974-76, 163 L.Ed.2d 824 (2006) (holding that it was not unreasonable for a state court to determine that a prosecutor’s explanations were race-neutral for Batson purposes). Further, state-court factual findings must be “presumed to be correct,” and the habeas petitioner “must rebut[ ] the presumption of correctness by clear and convincing evidence.” 28 U.S.C. § 2254(e)(1); see also Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005).
AEDPA similarly requires us to give considerable deference to a state appellate court’s legal judgments. In reviewing questions of law, we may not reverse under AEDPA unless the state’s court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). This inquiry is “straightforward.” Lockyer v. Andrade, 538 U.S. 63, 74-75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). We look to the Supreme Court’s “holdings, as opposed to dicta,” to determine whether clearly established federal law exists. Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). And, if clearly established federal law applies, it’s not enough for the state court to incorrectly apply the law: “[A]n unreasonable application of federal law is different from an incorrect application.” Id. at 409, 120 S.Ct. 1495; see also id. at 411, 120 S.Ct. 1495 (“[A] federal habeas court may not issue a writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.”).
We’re thus left with only two ways to reverse: First, we would have to find that the state court’s factual findings were unreasonable, and petitioner rebutted them with clear and convincing evidence. Or, in the alternative, we would have to hold that this determination was a question of law, and the state court’s decision unreasonably *1213 applied clearly established federal law. Namely, there would have to be some clear-cut Supreme Court rule that certain magic words automatically bring all questioning to a halt — regardless of the circumstances surrounding the interrogation. Here, neither is the case.
The state court found, for better or for worse, that Anderson’s attempted invocation of his right to remain silent was ambiguous and that the officer’s following question legitimately sought clarification. Absent a bright-line rule from the Supreme Court, the state-court conclusion is a reasonable determination of the facts.
Right to Counsel
Anderson also contends that he validly invoked his right to counsel and did not subsequently waive this right prior to the confession. Once Anderson stated “I’d like to have an attorney present,” the interrogating officers stopped the interrogation and turned the tape recorder off. However, Anderson unilaterally continued the conversation and asked what was going to happen to him. Accordingly, the interrogating officers were not prohibited from further questioning. See Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (holding that the question, “Well, what is going to happen to me?” is enough to “initiate” conversation after requesting a lawyer). In response to the officers’ statements that they could not talk to him, Anderson clarified that he “was just jokin[g]” and stated “I don’t want an attorney. I’ve changed my mind.” Therefore, Anderson validly waived his right to counsel. See Id. at 1046, 103 S.Ct. 2830.
Coercion Claims
Anderson next argues that the interrogating officers coerced his confession because they withheld basic needs, such as cigarettes and warm clothing, until he agreed to talk, exploited his mental condition brought on by chronic drug use, threatened him with the death penalty and ignored his requests to remain silent. The record does not support a finding of an involuntary confession. See United States v. Coleman, 208 F.3d 786, 791 (9th Cir.2000) (heroin withdrawal and physical discomfort not enough to establish involuntariness of confession); United States v. Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988) (promise to recommend leniency not enough).
Finally, Anderson argues that the trial court improperly excluded evidence of coercion. The state court reasonably concluded that the criminal trial court did not violate the holding of Crane v. Kentucky, 476 U.S. 683, 688-91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Petitioner was not prevented from presenting evidence of the physical and psychological environment that yielded the confession. Exclusion of purported expert testimony of petitioner’s self-image and other aspects of the volun-tariness of the confession, if error, was harmless.
The standard of review is critical here. Under AEDPA, we must give deference to state-court factual and legal determinations, which in this case are reasonable in light of the evidence presented in the state-court proceedings and the lack of clearly established federal law to the contrary. The district court’s judgment denying Anderson’s petition for writ of habeas corpus is therefore AFFIRMED.

. Anderson does not argue that this was an unequivocal invocation of his right to remain silent.

. Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, § 104, 110 Stat. 1214, 1218 (1996) (amending 28 U.S.C. § 2254). AEDPA "modified a federal habeas court’s role in reviewing state prisoner applications in order to prevent federal habeas 'retrials’ and to ensure that state-court convictions are given effect to the extent possible under law.” Bell v. Cone, 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 403-04, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).